## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.** _____ |
| **UNITED STATES DEPARTMENT OF** | § | |
| **HEALTH AND HUMAN SERVICES;** | § | |
| **XAVIER BECERRA, in his official** | § | |
| **capacity as Secretary of the United States** | § | |
| **Department of Health and Human** | § | |
| **Services; CENTERS FOR MEDICARE** | § | |
| **& MEDICAID SERVICES; and** | § | |
| **CHIQUITA BROOKS-LASURE, in her** | § | |
| **official capacity as Administrator of the** | § | |
| **Centers for Medicare and Medicaid** | § | |
| **Services,** | § | |
| *Defendants.* | | |

---

## PLAINTIFF STATE OF TEXAS' ORIGINAL COMPLAINT

---

1.     The State of Texas ("Texas") brings this action to set aside (i.e., vacate) and enjoin Defendants from enforcing the Centers for Medicare and Medicaid Services ("CMS") Final Rule entitled "Medicare and Medicaid Programs; Minimum Staffing Standards for Long-Term Care Facilities and Medicaid Institutional Payment Transparency Reporting" ("the Final Rule"), 89 Fed. Reg. 40876 (May 10, 2024).

2.     The Final Rule imposes new minimum nurse staffing requirements on nursing homes (also known as "long-term care facilities") as a condition of their participation in Medicare and Medicaid. Because 97% of all nursing homes participate in these programs, the Final Rule will impact nearly every nursing home in America.

3.     The Final Rule's new requirements depart sharply from both black letter law and decades of precedent. Historically, Congress has required that (1) a nursing home "must use the

services of a registered professional nurse [("RN")] for at least 8 consecutive hours a day, 7 days a week"; and (2) a nursing home "must provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents." *Id.* §1396r(b)(4)(C)(i); *accord id.* §1395i-3(b)(4)(C)(i).

4.     The new requirements remove the historic flexibility of a nursing home to determine what is "sufficient to meet the nursing needs of its residents." *Id.* Instead, the CMS Final Rule now imposes a one-size-fits-all rule that directly contravenes Congress's stated flexible directive with rigid, inflexible requirements.

5.     First, the Final Rule triples the required onsite hours of the RN from 8 to 24 hours per day, 7 days per week. 89 Fed. Reg. at 40898, 40997. Second, it changes the flexible 'sufficiency' standard to a set of three quantitative requirements: (1) total nurse staffing of at least 3.48 hours per resident day ("HRPD"); (2) RN staffing of at least 0.55 HPRD; and (3) nurse aide ("NA") staffing of at least 2.45 HPRD. 89 Fed. Reg. at 40877. These rules apply regardless of the care facility's actual staffing needs.

6.     CMS—perhaps recognizing that its sweeping Final Rule departs from both Congress's directive and decades of precedent—claims that its power to promulgate this rule derives from provisions of the Medicare and Medicaid Acts that enable the agency to regulate in the interest of nursing home residents' health and safety. *Id.* at 40879, 40890-91. But CMS lacks the authority to override Congress's stated policy as enacted in the statute that empowers CMS to regulate in the first place. Moreover, imposing $4.3 billion dollars of cost per year on nursing homes across the country without statutory authorization violates the Major Questions Doctrine.

7.     Regardless, CMS's rule is arbitrary and capricious in violation of the Administrative Procedure Act ("APA"). CMS's longstanding agency position has been that nursing facilities caring for diverse resident populations with varying needs require a flexible regulatory approach. The new Final Rule does the exact opposite without considering the cost, feasibility, or preexisting reliance interests.

8.     CMS's Final Rule recognizes that the new requirements will force "more than 79 percent of nursing facilities nationwide" to hire more staff. 89 Fed. Reg.  at 40877. At the same time, CMS agreed that most nursing homes are already adequately staffed. CMS has not articulated why minimum staff requirements are needed, nor has CMS taken into account the massive nationwide nursing shortage that will make compliance for many long-term care facilities a practical impossibility.

9.      CMS recognizes that "Texas will need to hire the most [additional] RNs" of any state to comply with new requirements—about 2,579 RNs and 7,887 additional NAs, representing a 46.1% increase in RNs and a 28.4% increase in NAs. 89 Fed. Reg. at 40957, 40976-80. Texas does not have enough qualified people to hire to fill these newly required positions. *See id.* Moreover, smaller facilities in rural areas may disproportionately bear the impact of the regulations because they have to compete for employees against larger, urban facilities with more resources. *See* ACHA Comments on Proposed Rule 21, 31 (Nov. 6, 2023), 10, *available at* https://www.regulations.gov/comment/CMS-2023-0144-43877.

10.    CMS recognizes that Texas facilities alone will need to spend *half a billion dollars per year* to comply with the requirements—$84 million on the 24/7 RN requirement, and $409 million on the HRPD requirements. 89 Fed. Reg. at 40958, 40960, 40983.

11.    In creating this Final Rule, CMS primarily relied on a flawed study that does not even support CMS's chosen staffing levels. Nowhere does CMS articulate the supposed benefit of the minimum nurse staffing levels.

12.    The extra costs will put long-term care facilities out of business to the detriment of their residents and of future residents who will have fewer choices.

13.    The Final Rule lacks statutory authority and is arbitrary and capricious. The Court should vacate it, set it aside, and permanently enjoin its enforcement. 5 U.S.C. § 706.

## I.     PARTIES

14.    Plaintiff Texas is a sovereign State of the United States.

15.     Defendant United States Department of Health and Human Services ("HHS") is a cabinet-level federal executive branch agency organized under the laws of the United States. It is responsible for administering federal healthcare policy and is the cabinet-level Department of which CMS is a part. It is responsible for administering Medicare and Medicaid.

16.     Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity.

17.     Defendant Centers for Medicare & Medicaid Services ("CMS") is the agency within HHS responsible for administering Medicare and for working with the States to administer Medicaid.

18.     Defendant Chiquita Brooks-Lasure is the Administrator of CMS. She is sued in her official capacity.

## II.     JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331. This Court has authority to grant the remedy Texas seeks pursuant to 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. § 706.

20.     42 U.S.C. § 1395ii, incorporating 42 U.S.C. § 405(h), is not a jurisdictional bar to this suit because:

(1)   Texas is not an "institution or agency" that is dissatisfied with a determination of the Secretary and who is entitled to an administrative hearing. 42 U.S.C. § 1395cc(h)(1)(A); *Texas v. Becerra*, 575 F. Supp. 3d 701, 712 (N.D. Tex. 2021); *Missouri v. Biden*, 571 F. Supp. 3d 1079, 1086 (E.D. Mo. 2021), *rev'd on other grounds*, No. 21-3725, 2022 WL 1093036 (8th Cir. Apr. 11, 2022);

(2)   Texas has a procedural right to bring claims under the Administrative Procedure Act ("APA"). *Becerra*, 575 F. Supp. 3d at 712;

(3)   Texas's claims arise under both the Medicaid Act, to which the jurisdictional bar does not apply, and the Medicare Act. *Becerra*, 575 F. Supp. 3d at 712; *Biden*, 571 F. Supp. 3d at 1086.

(4) Exhaustion of remedies under 42 U.S.C. § 405(h) would prove futile. *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000); *McCarthy v. Madigan*, 503 U.S. 140, 147–148 (1992); and

(5) Even if the above reasons did not apply—which they do—42 U.S.C. § 1395ii does not apply to challenges to the validity of regulations and does not apply to this case. *Ill. Council*, 529 U.S. at 33 (Thomas, J., dissenting, joined by Stevens, and Kennedy, JJ., and in relevant part by Scalia. J. (cleaned up)). *Ill. Council*'s holding to the contrary should be overruled.

21.     Venue is proper in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. § 1391(e), as two United States agencies, and two of its officers in their official capacities are defendants. Plaintiff Texas resides in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

### III.     BACKGROUND

#### i.     Medicare and Medicaid

#### A.  The Statutory Provisions

22.     Medicare is a federal program that "provides basic protection against the costs of hospital, related post-hospital, home health services, and hospice care" to individuals 65 and older, as well as those with certain disabilities or conditions. 42 U.S.C. § 1395c. Medicaid is a joint federal-state program that provides "payment of part or all of the cost of [certain] care and services" and "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care" to low-income individuals. 42 U.S.C. §§ 1396-1, 1396a, 1396d(a).

23.     Nursing homes that wish to participate in Medicare must comply with the statutory requirements for "skilled nursing facilities" set forth at 42 U.S.C. § 1395i-3. Nursing homes that wish to participate in Medicaid must meet the largely parallel set of statutory requirements for "nursing facilities" set forth at 42 U.S.C. § 1396r.

24.     Skilled nursing facilities (Medicare) and nursing facilities (Medicaid) are often collectively referred to as "long-term care facilities." See, *e.g.*, 42 CFR Subpart B ("Requirements for Long Term Care Facilities") (providing requirements for both skilled nursing facilities and nursing facilities).

25.     The collective term is convenient for referring to both types of facilities because the relevant statutory requirements for the two types of facilities are parallel or identical.

26.     Subsection (b)(4)(C) of 42 U.S.C. § 1395i-3 (Medicare) is entitled "Required nursing care."

27.     Subsection (b)(4)(C) of 42 U.S.C. § 1396r (Medicaid) is entitled "Required nursing care; facility waivers."

28.     Both subsections establish minimum required levels of nursing care that long-term facilities must provide in order to participate in Medicare or Medicaid.

29.     No other subsection of 42 U.S.C. § 1395i-3 (Medicare) or 42 U.S.C. § 1396r (Medicaid) explicitly addresses required levels of nursing care that long-term facilities must provide in order to participate.

30.     Both types of long-term care facilities "must provide 24-hour licensed nursing service which is sufficient to meet the nursing needs its residents." 42 U.S.C. § 1395i-3(b)(4)(C)(i) (Medicare); 42 U.S.C. § 1396r(b)(4)(C)(i)(I) (Medicaid) (with non-substantive grammatical modifications).

31.     Both types of long-term care facilities "must use the services of a registered professional nurse for at least 8 consecutive hours a day, 7 days a week." 42 U.S.C. § 1395i-3(b)(4)(C)(i) (Medicare); 42 U.S.C. § 1396r(b)(4)(C)(i)(II) (Medicaid).

32.     The Secretary of Health and Human Services may waive those requirements for skilled nursing facilities subject to Medicare rules under some conditions. 42 U.S.C. § 1395i-3(b)(4)(C)(i), (ii). A State may waive those requirements under some circumstances for nursing facilities subject to Medicaid rules under similar conditions, but the Secretary of Health and Human Services "shall assume and exercise the authority of the State to grant waivers" if the

Secretary "determines that a State has shown a clear pattern and practice of allowing waivers in the absence of diligent efforts by facilities to meet the staffing requirements." 42 U.S.C. § 1396r(b)(4)(C) (i), (ii), (iii).

33.     Neither 42 U.S.C. § 1395i-3(b)(4)(C) (Medicare) nor 42 U.S.C. § 1396r(b)(4)(C) (Medicaid) authorizes the Secretary to set an identical number of hours per resident day ("HPRD") of total nurse staffing for every long-term care facility, regardless of their residents' actual needs and regardless of differing needs for differing facilities, rather than require nursing services "sufficient to meet the nursing needs" of each facility's residents.

34.     Neither 42 U.S.C. § 1395i-3(b)(4)(C) (Medicare) nor 42 U.S.C. § 1396r(b)(4)(C) (Medicaid) authorize the Secretary to set an identical HRPD for Registered Nurse ("RN") staffing for every long-term care facility, regardless of their residents' actual needs and regardless of differing needs for differing facilities, rather than require nursing services "sufficient to meet the nursing needs" of each facility's residents.

35.     Neither 42 U.S.C. § 1395i-3(b)(4)(C) (Medicare) nor 42 U.S.C. § 1396r(b)(4)(C) (Medicaid) authorize the Secretary to set an identical HRPD for nurse aid staffing for every long-term care facility, regardless of their residents' actual needs and regardless of differing needs for differing long-term facilities, rather than require nursing services "sufficient to meet the nursing needs" of each facility's residents.

36.     Neither 42 U.S.C. § 1395i-3(b)(4)(C) (Medicare) nor 42 U.S.C. § 1396r(b)(4)(C) (Medicaid) authorize the Secretary to increase or otherwise modify the number of hours for which long-term facilities must use the services of a registered professional nurse from "at least 8 consecutive hours a day, 7 days a week."

### B.  No Substantive Statutory Changes to Nursing-staffing Requirements

37.     The original enactment of the Medicare and Medicaid programs defined "extended care facility" as an institution that, among other things, "provides 24-hour nursing service which is sufficient to meet nursing needs in accordance with the policies developed as provided in

paragraph (2), and has at least one registered professional nurse employed full time." Pub. L. No. 89-97 § 1861(j)(6), 79 Stat. 286, 317 (July 30, 1965).

38.    It also defined "extended care services" as certain "services furnished to an inpatient of an extended care facility." *Id.* § 1861(j)(h), 79 Stat. at 316.

39.    It also provided benefits for Medicare participants receiving extended care services. *Id.* at § 226(a), (b), 79 Stat. at 290.

40.    Thus, extended care facilities wishing to participate in Medicare had to comply with (1) a 24-hour nursing service requirement and (2) a full-time employed registered professional nurse requirement.

41.    In 1972, the statute was amended to replace the term "extended care facility" with "skilled nursing facility." Pub. L. No. 92-603, § 278, 86 Stat. 1329, 1424–25, 1426–27 (Oct. 30, 1972).

42.    It was also amended to apply the 24-hour nursing service requirement and the full-time employed registered professional nurse requirement to benefits for both Medicare and Medicaid participants receiving services at skilled nursing facilities. *Id.* at §§ 246, 249A, 86 Stat. at 1453–54.

43.    It was also amended to include the first version of the waiver provisions. *Id.* § 267, 86 Stat. at 1450.

44.    42 U.S.C. § 1395i-3(b)(4)(C)(i), the statute requiring a certain level of nursing care in skilled nursing facilities participating in Medicare, was enacted in its current form in 1987 and 1988. Pub. L. No. 100-203 § 4201(a)(3), 101 Stat. 1330, 1330-160 (Dec. 22, 1987) (adding 42 U.S.C. § 1395i-3); 1330-163 (adding subsection (b)(4)(C)(i)); Pub. L. No. 100-360 § 411(l)(1)(A)(ii), 101 Stat. 683, 800–01 (Jul. 1, 1988) (making technical corrections to subsection (b)(4)(C)(i)).

45.    The only non-stylistic difference from the prior statute was replacing "has at least one registered professional nurse employed full time" with "must use the services of a registered professional nurse at least 8 consecutive hours a day, 7 days a week" (the 8/7 requirement). *Id.*

46.    There have not been any changes to 42 U.S.C. § 1396i-3(b)(4)(C)(i) since 1988.

47.     Likewise, 42 U.S.C. § 1396(b)(4)(C)(i), the statute requiring a certain level of nursing care in nursing facilities participating in Medicaid, was also enacted in its current form in 1987 and 1988. Pub. L. No. 100-203 § 4211(a)(3), 101 Stat. at 1330-183–184 (adding 42 U.S.C. § 1396r), 1330-186 (adding subsection (b)(4)(C)(i)); Pub. L. No. 100-360 § 4ii(l)(3)(A)(i), (ii), 101 Stat. 683 at 802 (making technical corrections to subsection (b)(4)(C)(i)).

48.     The only non-stylistic difference from the prior statute was replacing "has at least one registered professional nurse employed full time" with "must use the services of a registered professional nurse for at least 8 consecutive hours a day, 7 days a week" (the 8/7 requirement). *Id.*

49.     There have not been any changes to 42 U.S.C. § 1396r(b)(4)(C)(i) since 1988.

50.     In sum, the Medicare rules since 1965, and the Medicaid rules since 1972, have required both types of long-term care facilities to comply with (1) the 24-hour nursing service requirement, and (2) the full-time employed registered professional nurse requirement, which was slightly changed to the 8/7 requirement in 1987.

51.     Significantly, in 1973, the year after the statute was first amended, the Social Security Administration specifically rejected calls in the notice and comment period to implement nurse-to-patient ratios. 39 Fed. Reg. 2238, 2239 (Jan. 17, 1974). The agency reasoned that "the variation from facility to facility in the composition of its nursing staff, physical layout, patient needs[,] and the services necessary to meet those needs precludes setting such a figure." *Id.* It further reasoned that "[a] minimum ratio could result in all facilities striving only to reach that minimum and could result in other facilities hiring unneeded staff to satisfy an arbitrary quota." *Id.*

52.     In 2016, CMS again rejected "many comments" urging CMS to "establish and require minimum staffing levels and require a registered nurse to be in the LTC facility 24 hours a day, 7 days a week." 81 Fed. Reg. 68688, 68754 (Oct. 4, 2016). CMS concluded that "a 'one size fits all' approach" to staffing was inappropriate. *Id.* at 68755. It expressed "concerns about mandatory ratios" and "a 24/7 RN presence" because "LTC facilities are varied in their structure and in their resident populations." *Id.* at 68754-56, 68758; *see also* 80 Fed. Reg. 42168, 42201 (July

16, 2015) (emphasizing the importance of "taking acuity levels into account"). Instead, the "focus" of CMS regulations "should be on the skill sets and specific competencies of assigned staff to provide the nursing care a resident needs rather than a static number of staff or hours of nursing care." *Id.* at 42201. CMS further reasoned that a 24/7 RN requirement "could negatively impact the development of innovative care options, particular[ly] in smaller, more home-like settings," and that "geographic disparity in supply could make such a mandate particularly challenging in some rural and underserved areas." 81 Fed. Reg. at 68755.

## ii.   The Final Rule

### A.   The Administration's Announcement and the Staffing Study

53.   On February 28, 2022, the Biden Administration announced a "reform" that "will ensure that every nursing home provides a sufficient number of staff who are adequately trained to provide high-quality care." FACT SHEET: Protecting Seniors by Improving Safety and Quality of Care in the Nation's Nursing Homes, Feb. 24, 2022.[1]

54.   The Fact Sheet elaborated on what it also labelled a "new initiative":

Establish a Minimum Nursing Home Staffing Requirement. The adequacy of a nursing home's staffing is the measure most closely linked to the quality of care residents receive. For example, a recent study of one state's nursing facilities[2] found that increasing registered nurse staffing by just 20 minutes per resident day was associated with 22% fewer confirmed cases of COVID-19 and 26% fewer COVID-19 deaths. CMS intends to propose minimum standards for staffing adequacy that nursing homes must meet. CMS will conduct a new research study to determine the level and type of staffing needed to ensure safe and quality care and will issue proposed rules within one year. Establishing a minimum staffing level ensures that all nursing home residents are provided safe, quality care, and that workers have

---

[1]   https://www.whitehouse.gov/briefing-room/statements-releases/2022/02/28/fact-sheet-protecting-seniors-and-people-with-disabilities-by-improving-safety-and-quality-of-care-in-the-nations-nursing-homes/

[2]   Li, Temkin-Greener, Shan, & Cai, "COVID-19 Infections and Deaths among Connecticut Nursing Home Residents: Facility Correlates" (available at https://agsjournals.onlinelibrary.wiley.com/doi/abs/10.1111/jgs.16689)

the support they need to provide high-quality care. Nursing homes will be held accountable if they fail to meet this standard.

*Id.*

55.     "Hours per resident day" ("HPRD") means the average hours of care that each resident receives per day. Thus, when the Fact Sheet says that "increasing registered nurse staffing by just 20 minutes per resident day," then in the case of a facility with 50 residents, that is an increase of "just" 1,000 minutes of care, which is a little more than an additional 16 hours of care per day, or 116 hours a week. In other words, it is "just" three additional 40-hour-a-week positions for 50 residents.

56.     As directed in the Fact Sheet, CMS commissioned a private firm, Abt Associates, to perform the "new research study to determine the level and type of staffing needed to ensure safe and quality care" (the "Abt Staffing Study").[3]

57.     The Abt Associates "study was conducted on a compressed timeframe, with data collection and analysis included in this report primarily completed between June and December 2022. The short duration reflects the time-sensitive nature of the study and CMS's timeline for proposing a minimum staffing requirement in support of the Presidential initiative." Abt Staffing Study at xix.

58.     Abt Associates noted, "Nurse staffing levels vary considerably across nursing homes nationwide, and by nursing home characteristics such as location, size, and profit status. Federal regulations require nurse staff availability 24 hours a day, but do not specify a minimum staffing level. Thirty-eight states and the District of Columbia have a minimum staffing requirement." *Id.* at xi.

59.     Texas does not have a minimum staffing requirement.

---

[3]     Abt Associates, "Nursing Home Staffing Study: Comprehensive Report" (available at https://www.cms.gov/files/document/nursing-home-staffing-study-final-report-appendix-june-2023.pdf)

60.     Abt Associates performed a review of literature studying "the relationship between nursing home staffing and quality outcomes," and concluded the literature "does not provide a clear evidence basis for setting a minimum staffing level." *Id.* at xi.

61.     Abt Associates included a Connecticut study cited in the Fact Sheet as part of its literature review and determined that the Connecticut study's results were *not generalizable*, *id.* at A-35, despite the Administration's use of that study in the Fact Sheet to generalize.

### a. Nursing Home Quality

62.     Abt Associates then attempted to measure "the relationship between nursing home staffing and quality outcomes" itself by creating "quality measure" (or QM) scores and a health inspection survey score.

63.     Abt Associates "calculated a composite measure of nursing home quality, referred to hereafter as the 'total QM [quality measures] score" for each nursing home. *Id.* at 41. It considered several short-term and long-term measures in calculating QMs but eliminated measures that "were weakly or not significantly related to nursing home staffing levels." *Id.* Thus, Abt Associates' QM scores are significantly related to nursing home staffing levels—in other words, Abt Associates' QM scores simply measure nursing home staffing levels, not "quality."

64.     Abt Associates admits that "though these QM data capture a wide range of quality and safety metrics, there are important dimensions of quality that are meaningful for residents or other stakeholders (e.g., quality of life) that these analyses are unlikely to capture." *Id.* at 65.

65.     In other words, Abt Associates' quality measure scores do not measure quality of life and "other important dimensions of quality."

66.     But Abt Associates' QM scores do measure nursing home staff levels.

### b. Nursing Home Safety

67.     Abt Associates also calculated a within-states health inspection survey score, which it stated is "a proxy for nursing care safety." *Id.* at 53.

12

68.     "One challenge to using health inspection data for safety outcomes is that health inspection surveys are not uniformly implemented across states. Therefore, all measures of health inspection performance must be converted into a form that allows comparison of nursing homes in different states." *Id.* at 80.

69.     For each State, Abt Associates ranked each nursing home "according to their total scores on the latest health inspection survey by the end of the year" and assigned a score of 0 to 100, depending on where a nursing home was ranked. *Id.* at G-2.

70.     Thus, Abt Associates assigns a nursing home a health inspection score only in relation to its score compared to other nursing homes in its State—not with respect to any particular level of care, and completely unrelated to whether the nursing home passed the inspection.

71.     For instance, in a State where all nursing homes passed inspection, Abt Associates would assign 50% of the nursing homes in the state a below-average health inspection score.

72.     Thus, Abt Associates' health inspection score for a nursing home does not measure whether the nursing home passed health inspections.

73.     Abt Associates admits that "[t]here are differences in results of health inspection surveys across states that might not be related to quality of care." *Id.* at 65.

### c.   The Relative, Not Absolute, Nursing Home Quality and Safety Measures

74.     Abt Associates used "two definitions of minimally acceptable quality and safety standards, based on the 25th and 50th percentiles of the total QM score and the within-state health inspection survey score." Abt Staffing Study at 112.

75.     In other words, Abt Associates defines "minimally acceptable quality and safety standards" for nursing homes relatively (compared to each other), not absolutely (compared to objective quality and safety standards).

76.     Thus, no matter how high (or low) QM scores and health inspection survey scores are, 50% or 25% of nursing homes will always be found to fail to meet "minimally acceptable quality and safety standards" under Abt Associates' methodology.

77.     In an example of a State where all nursing homes passed inspection, Abt Associates would nevertheless say that 50% or 25% of the nursing homes in the State failed to meet minimally acceptable safety standards because there are always nursing homes ranked in the lower half or the lowest quarter.

78.     So, no matter what percentage of nursing homes pass inspection in a State, Abt Associates would conclude that 50% or 25% failed to meet minimally acceptable safety standards because there will always be nursing homes ranked in the lower half or the lowest quarter.

79.     Even if the percentage of nursing homes pass inspection in a State goes up or down—even greatly up or greatly down—Abt Associates would always find that 50% or 25% of the nursing homes in the State failed to meet minimally acceptable safety standards because there are always nursing homes ranked in the lower half or the lowest quarter.

80.     Likewise, no matter what distribution of QM Abt Associates calculates, and no matter if those numbers go up or go down, Abt Associates would always say that 50% or 25% of nursing homes in the country failed to meet minimally acceptable quality standards because there are always nursing homes ranked in the lower half or the lowest quarter.

### d. The Irrelevance of Predicted Probability of Ranking in the Top 50% or 75% of "Quality" and "Safety" Based on Staffing Levels

81.     Abt Associates produced a chart of "Predicted Probability of Exceeding Minimum Acceptable Quality Standards for Total QM Score, by Total Nurse Staffing Level." *Id.* at 50–52.

82.     Abt Associates divided all nursing homes into ten deciles, based on nursing hours per resident day, and then predicted the probability of a nursing home in one of the ten deciles being in the top 50% or top 75% of the ranking of QM scores.

83.     Since QM scores measure nursing staffing levels, it is not surprising that Abt Associates predicts that nursing homes in the bottom deciles of nursing staffing are less likely than nursing homes in the top deciles to be in top 50% or top 75% of the ranking of QM scores.

84.     Even so, and even if the chart had any relevance at all to quality measures, the correlation between nursing staffing levels and being in the top 50% or top 75% of QM scores is weak. 40.9% of nursing homes in the bottom 20% of nursing staff levels are predicted to be in the top 50% of QM scores, and 61.2% of nursing homes in the top 10% of nursing staff levels are predicted to be in the top 50% of QM scores. And 66.9% of nursing homes in the bottom 20% of nursing staff levels are predicted to be in the top 75% of QM scores, and 85.1% of nursing homes in the top 10% of nursing staff levels are predicted to be in the top 75% of QM scores. *Id.* at 49–50.

85.     At the 50% level, Abt Associates notes, "This increase from 40.9 percent to 61.2 represents a gain with increasing total nurse staffing of more than 20 percentage points." At the 75% level, it notes "a gain with increasing total nurse staffing of more than 18 percentage points." *Id.*

86.     But, more relevantly, the numbers show that nursing staffing levels do not guarantee any great likelihood of whether a nursing home is predicted to be in the top 50% or 75% of the ranking of Abt Associates' QM score rankings. All nursing homes are predicted to have between a 40.9% to 61% chance of being in the top 50%, and between a 66.9% and 85.1% chance of being in the top 75%, no matter what its nursing staffing levels.

87.     Abt Associates also produced a chart of "Predicted Probability of Exceeding Minimum Acceptable Quality Standards for Weighted Health Inspection Survey Score, by Total Nurse Staffing Level." *Id.* at 53–55.

88.     Abt Associates divided all nursing homes into ten deciles, based on nursing hours per resident day, and then predicted the probability of a nursing home in one of the ten deciles being in the top 50% or top 75% in the ranking of health inspection survey scores.

89.     The correlation between nursing staffing levels and being in the top 50% or top 75% of health inspection survey scores is weak. Even if the chart had any relevance at all to health

measures, 37.8% of nursing homes in the bottom 20% of nursing staff levels are predicted to be in the top 50% of health inspection ranking scores, and 72.7% of nursing homes in the top 10% of nursing staff levels are predicted to be in the top 50% of health inspection survey scores. And 64.5% of nursing homes in the bottom 20% of nursing staff levels are predicted to be in the top 75% of health inspection survey scores, and 89.7% of nursing homes in the top 10% of nursing staff levels are predicted to be in the top 75% of health inspection survey scores. *Id.* at 53.

90.    At the 50% level, Abt Associates notes, "The increase between the lowest and highest deciles examined is 34.9 percentage points." At the 75% level, it notes "a gain of 25.2 percentage points." *Id.*

91.    But, again, more relevantly, the numbers show that nursing staffing levels do not guarantee any great likelihood of whether a nursing home is predicted to be in the top 50% or 75% of Abt Associates' health inspection survey score rankings. All nursing homes are predicted to have between a 37.8% to 72.7% chance of being in the top 50%, and between a 64.5% and 89.7% chance of being in the top 75%, no matter what its nursing staffing levels.

### e. The Irrelevance of "What if" Scenarios Based on the Predicted Probabilities

92.    Abt Associates "predicted probabilities from the logistic regression model results described above to generate 'what-if' scenarios representing the percentage of nursing homes predicted to exceed the 50th and 25th percentile performance standards under different minimum staffing requirements. The intent of these analyses is to model changes in predicted quality and safety associated with implementing potential minimum staffing requirements." *Id.* at 56.

93.    It analyzed twelve possible minimum staffing requirement options:

(1)    a three-requirement structure for hours per resident day (total nurse staffing, total licensed nurse staffing, and RN staffing) at four levels:

  low   3.30 total, 1.15 licensed, 0.45 RN

  medium  3.48 total, 1.23 licensed, 0.52 RN

  higher  3.67 total, 1.32 licensed, 0.60 RN

highest  3.88 total, 1.43 licensed, 0.70 RN

(2) a two-requirement structure for hours per resident day (RN, nurse aides (NA)) at four levels:

low   0.45 RN, 2.15 NA

medium  0.52 RN, 2.25 NA

higher  0.60 RN, 2.35 NA

highest  0.70 RN, 2.45 NA

(3) a four-requirement structure for hours per resident day (total nurse staffing, RNs, LVNs,[4] and NA) at four levels:

low   3.30 total, 0.45 RN, 0.70 LVN, 2.15 NA

medium  3.48 total, 0.52 RN, 0.71 LVN, 2.25 NA

higher  3.67 total, 0.60 RN, 0.72 LVN, 2.35 NA

highest  3.88 total, 0.70 RN, 0.73 LVN, 2.45 NA

*Id*. at xiv–xvii.

94.  Abt Associates predicted that between 43% and 90% of long-term facilities would have to add staff to comply with the twelve minimum staffing requirements, depending on the requirement. *Id.*

95.  It also predicted the costs of each of the twelve requirements at between $1.5 billion and $6.8 billion per year, depending on the requirement. *Id.*

96.  It also stated that 49% of long-term care facilities currently achieve a quality measure score above the median without any minimum staffing requirements but predicted that between 49% and 57% would achieve a quality measure score above the current median under the twelve requirements, depending on the requirement. *Id.*

---

4 Abt Associates uses "LPN" to stand for "licensed practical/vocational nurses." Abt Staffing Study at 124. LPN and LVN are substantively the same. Different States use different terminology. Texas will use the Texas term, "LVN," in this complaint.

97.     It also stated that 74% of long-term care facilities currently achieve a quality measure score above the lowest quartile without any minimum staffing requirements but predicted that between 76% and 82% would achieve a quality measure score above the current lowest quartile under the twelve requirements, depending on the requirement. *Id.*

98.     It also stated that 50% of long-term care facilities currently achieve a health inspection safety score above the median without any minimum staffing requirements but predicted that between 51% and 53% would achieve a health inspection safety score above the current median under the twelve requirements, depending on the requirement. *Id.*

99.     It also stated that 74% of long-term care facilities currently achieve a health inspection safety score above the lowest quartile without any minimum staffing requirements but predicted that between 76% and 79% would achieve a health inspection safety score above the current lowest quartile under the twelve requirements, depending on the requirement. *Id.*

100.    As Abt Associates summed it up: "The predicted percentage of nursing homes exceeding minimally acceptable quality and safety thresholds would increase between 1 percentage point and nearly 8 percentage points across four potential minimum staffing requirement options ranging from low (below the current median) to high total nurse staffing." *Id.* at vii (first "key takeaway" from the study).

101.    In fact, under one of the twelve possible requirements (the three-requirement structure, medium level), Abt Associates says that the percentage of nursing homes exceeding minimally acceptable quality thresholds would increase 0 percentage points (from 49% to 49%). *Id.* at xiv, xv.

102.    Although Abt Associates does not say so, to the extent that QM and health inspection survey scores would be increased by imposing one of the twelve "what-if" scenarios, that would generate new 25th and 50th percentiles and thus 25% or 50% of nursing homes would *still* fall below "minimally acceptable quality and safety standards" as defined by Abt Associates.

103.    Thus, the "increases" to which Abt Associates refers are in relation to the former 25th and 50th percentiles, not the new ones. These increases are irrelevant since many nursing

homes with increased scores would still be deemed to fall below "minimally acceptable quality and safety standards" under the newly calculated 25th and 50th percentiles.

104.     Nonetheless, even giving Abt Associates the benefit of the doubt, it believes that either 50% or 25% of long-term care facilities currently do not meet minimally acceptable quality and safety standards, but that between 0% and 8% more would meet minimally acceptable quality and safety standards if the government imposed one of the twelve proposed minimum staffing requirements—at a cost of between $1.5 billion and $6.8 billion per year, and which would require that between 43% and 90% of long-term facilities hire additional staff.

### f.   Abt Associates Fails to Discuss any Need for 24/7 Nursing Services

105.     Nothing in the Abt Staffing Study supports the idea that all long-term care facilities must have a registered nurse *onsite* 24 hours a day, 7 days a week.

106.     In fact, Abt Associates notes that "[o]nly six [S]tates require an RN on site 24 hours a day regardless of facility size." Abt Staffing Study at A-10.

### g.   Abt Associates Conclusion that There is Only Evidence of *Potential* Benefits of Minimum Nursing Staffing Requirements in Long-term Care Facilities

107.     The best Abt Associates can say to begin its conclusion is that "[c]ollectively, the Staffing Study provides evidence both on *potential minimum staffing requirement benefits* and on potential barriers to and unintended consequences of implementation." *Id*. at 121 (emphasis added).

108.     Abt Associates presumably tried very hard to "propos[e] a minimum staffing requirement in support of the President's initiative," and looked very hard for evidence of minimum staffing requirement benefit—but could only find evidence of "potential" benefits.

109.     Necessarily, evidence of potential benefits is also evidence of no benefits.

110.     The study does not in fact show any real or "potential" benefits resulting from small increases in irrelevant QM scores and health inspection survey scores resulting from very expensive minimum staffing requirements which would result in 43 to 90 percent of nursing homes having to increase staffing.

111.    Abt Associates noted the possibility that "workforce shortages and current hiring challenges could present barriers to nursing home compliance with a new federal staffing requirement." *Id.* at xxi. But it disregarded that possibility and "did not comprehensively address the feasibility of implementing a minimum staffing requirement and did not review national health care staffing shortages, health care workforce distribution, or access to health care training and education programs." *Id.*

112.    It also noted, but disregarded, "several potential unintended consequences of a national minimum staffing requirement, such as that nursing homes might i) not be able to meet the required staffing levels; ii) reduce resident admissions to meet requirements; or iii) close down entirely, thus potentially reducing access to care." *Id.*

### B.  The Final Rule

#### a.  CMS uses the Abt Staffing Study to justify the Final Rule

113.    Armed with the Abt Staffing Study that incorrectly asserted *potential* minimum staffing requirement benefits, CMS adopted the Final Rule that imposes minimum staffing requirements.

114.    Citing only the Abt Staffing Study, CMS claims that "the minimum staffing standard is supported by literature evidence, analysis of staffing data and health outcomes, discussions with residents, staff, and industry." 89 Fed. Reg. at 40877 and n.8.

115.    CMS claims that "the minimum staffing standard is supported by … other factors." *Id.* It later specifies that the "other factors" were "two listening sessions." 89 Fed. Reg. at 40881.

116.    CMS adopted Abt Associates' evidence-free conclusions that "[i]ncreasing nursing staffing levels are associated with benefits including enhanced safety and quality." *Id.*

117.    It also agreed with Abt Associates that "[t]here is no clear, consistent, and universal methodology for setting specific minimum staffing standards, as evidenced by the varying current

standards across the 38 States and the District of Columbia that have adopted their own staffing standards." *Id.*

118.    CMS set specific minimum staffing standards anyway.

### b.  The Rule's Substance

119.    The statute requires long-term facilities to "use the services of a registered professional nurse for at least 8 consecutive hours a day, 7 days a week" (the 8/7 requirement) 42 U.S.C. §§ § 1395i-3(b)(4)(C)(i), 1396r(b)(4)(C)(i)(II).

120.    But the Final Rule requires long-term care facilities to "have a registered nurse (RN) onsite 24 hours per day, for 7 days a week that is available to provide direct resident care" (a 24/7 requirement). 89 Fed. Reg. at 40997.

121.    The statute requires long-term facilities to "provide 24-hour licensed nursing service which is sufficient to meet the nursing needs its residents." 42 U.S.C. § 1395i-3(b)(4)(C)(i); 42 U.S.C. § 1396r(b)(4)(C)(i)(I).

122.    In other words, current "[f]ederal regulations require nurse staff availability 24 hours a day, but do not specify a minimum staffing level. Thirty-eight states and the District of Columbia have a minimum staffing requirement." Abt Staffing Study at xi.

123.    But the Final Rule requires that "[t]he facility must meet or exceed a minimum of 3.48 hours per resident day for total nurse staffing," which must include a "minimum of 0.55 hours per resident day for registered nurses" and a "minimum of 2.45 hours per resident day for nurse aides." 89 Fed. Reg. at 40996.

124.    All long-care facilities must meet the staffing requirements "regardless of the individual facility's resident case-mix, as they are the minimum standard of staffing." *Id.* at 40877.

### c.  CMS Does Not Explain the 24/7 Requirement

125.    Nothing in the Final Rule explains why CMS imposed the 24/7 requirement or changed the 8/7 requirement to the 24/7 requirement.

126.    Nothing in the Abt Staffing Study suggests that every long-term care facility requires a registered nurse on site 24/7.

### d. CMS Does Not Explain How it Chose the 3.48. 0.55, or 2.45 levels

127.    The levels that CMS imposed do not match any of the twelve minimum staffing scenarios considered in the Abt Staffing Study.

128.    In other words, the 3.48, 0.55, or 2.45 levels did not come from the Abt Staffing Study.

129.    CMS claims that the 3.48, 0.55, or 2.45 levels "were developed using case-mix adjusted data sources." 89 Fed. Reg. at 40877.

130.    It also states that the 0.55 and 2.45 levels (but not the 3.48 level) were discussed in the notice of proposed rulemaking, 88 Fed. Reg. 61352 (Sep. 6, 2023). 89 Fed. Reg. at 40891.

131.    In the notice of proposed rulemaking, CMS explained that "based on the findings reported in the [Abt Staffing Study], information gathered through the FY2023 SNF PPS RFI [a request for comments on minimum staffing requirements (see 88 Fed. Reg. at 61358)], listening sessions, assessment of the PBJ System data, and review of the literature evidence, we are proposing individual minimum staffing levels at 0.55 HPRD for RNs and 2.45 HPRD for NAs." 88 Fed. Reg. at 61369.

132.    The Abt Staffing Study provides no evidence for the 0.55 or 2.45 levels.

133.    A "review of the literature" did not provide evidence for the 0.55 or 2.45 levels because the literature "does not provide a clear evidence basis for setting a minimum staffing level." Abt Staffing Study at xi.

134.    CMS does not explain how "the FY2023 SNF PPS RFI, listening sessions, [or] assessment of the PBJ System data" provides evidence for the 0.55 or 2.45 levels.

135.    CMS acknowledges that "[t]he proposed RN requirement of 0.55 HPRD is higher than every State, and only lower than the District of Columbia. The proposed NA requirement of

2.45 HPRD is higher than all States and the District of Columbia, based on data from September 2022." 88 Fed. Reg. at 61367.

136.    But CMS does not explain why every State in the union is wrong and CMS is right.

137.    Finally, CMS has no explanation whatsoever for the 3.48 level, either in the notice of proposed rulemaking or the Final Rule, other than vaguely stating that it was "developed using case-mix adjusted data sources," 89 Fed. Reg. at 40877, but necessarily different "case-mix adjusted sources" than those supposedly used to develop the 0.55 and 2.48 levels, which are further explained in the notice of proposed rulemaking.

138.    The notice of proposed rulemaking seeks comments on the 3.48 level. 88 Fed. Reg. at 61,363. It does not seek comment on any other total nurse staffing level. Yet the notice of proposed rulemaking only explains (entirely insufficiently) how the 0.55 and 2.45 levels were developed, not how the 3.48 level was developed.

### e.    Effects of the Final Rule

139.    CMS estimates that the minimum staffing requirements will cost $4.3 billion per year over the next ten years. 89 Fed. Reg. at 40,949, 40,970.

140.    According to CMS, "[t]hese new required minimum staffing requirements will increase staffing in more than 79 percent of nursing facilities nationwide, and the specific RN and NA HPRD requirements exceed the existing minimum staffing requirements in nearly all States." *Id.* at 40,877.

141.    According to CMS, nationwide, the new required minimum staffing requirements will require 10,495 additional RNs in urban areas (an increase of 9.7%), 35,306 additional NAs in urban areas (an increase of 9.9%), 2,144 RNs in rural areas (an increase of 8.0%), and 8,787 additional NAs in rural areas (an increase of 9.2%). *Id.* at 40,958, 40,977–80 (showing increases due to the 24/7 requirement and the three hours per resident day requirements; Texas is citing only the largest increase for RNs and NAs to avoid double-counting).

142.    According to CMS, in Texas the new required minimum staffing requirements will require 1,615 additional RNs in urban areas (an increase of 36.3%), 3,460 additional NAs in urban areas (an increase of 16.0%), 311 RNs in rural areas (an increase of 27.3%), and 1,067 additional NAs in rural areas (an increase of 17.4%). *Id.*

143.    The Final Rule's policies are to be phased in over the next several years. 89 Fed. Reg. at 40,913. Facilities in non-rural areas must implement the 24/7 RN and the 3.48 total nurse hours per resident day requirements within 2 years and the 0.55 RN and 2.45 NA hours per resident day requirements within 3 years. *Id.* Rural facilities must implement the 24/7 RN and the 3.48 total nurse hours per resident day requirements within 3 years and the 0.55 RN and 2.45 NA hours per resident day requirements within 5 years. *Id.*

144.    Unlike Abt Associates, CMS does not attempt to quantify any benefits supposedly resulting from the minimum staffing levels in the Final Rule.

### C. The Claimed Authority for the Final Rule

#### a. CMS Explicitly does not Rely on the Subsection Addressing Long-term Facility Staffing Levels

145.    CMS explains its legal authority to adopt the Final Rule thus: "While sections [42 U.S.C. § 1395i-3(b)(4)(C)(i) and 42 U.S.C. § 1396r(b)(4)(C)(i)(I), (II)] state that a facility must provide 24-hour licensed nursing services which are sufficient to meet the nursing needs of its residents, and must use the services of a registered professional nurse for at least 8 consecutive hours a day, 7 days a week, CMS is using separate authority as described above to establish these new requirements rather than the authorities found at [42 U.S.C. § 1395i-3(b)(4)(C)(i) and 42 U.S.C. § 1396r(b)(4)(C)(i)(I), (II)]." 89 Fed. Reg. at 40,891.

146.    The "separate authority described above" is three provisions in 42 U.S.C. §§ 1395i-3 and 1396r.

**b. CMS Relies on a Subsection Addressing Miscellaneous Requirements**

147.    First, CMS cites 42 U.S.C. §§ 1396r(d)(4)(B) and 1395i-3(d)(4)(B), which require long-term care facilities to "meet such other requirements relating to the health, safety, and well-being of residents or relating to the physical facilities thereof as the Secretary may find necessary."

148.    CMS explains, "The Secretary has concluded that these HPRD levels and RN onsite 24/7 requirements are necessary for resident health, safety, and well-being, under [42 U.S.C. §§ 1396r(d)(4)(B) and 1395i-3(d)(4)(B)], which instruct the Secretary to issue such regulations relating to the health, safety, and well-being of residents as the Secretary may find necessary." 89 Fed. Reg. at 40,890.

149.    In both acts, subsection (d) is entitled "Requirements relating to administration and other matters."

150.    In both acts, subsection (d)(1) is entitled "Administration" and deals with administration in general, required notices of changes in ownership or administrator, and availability of reports.

151.    In both acts, subsection (d)(2) is entitled "Licensing and Life Safety Code" and requires long-term facilities to be state-licensed and to meet fire protection requirements.

152.    In both acts, subsection (d)(3) is entitled "Sanitary and Infection Control and Physical Environment" and requires a safe and sanitary environment.

153.    In both acts, subsection (d)(4) is entitled "Miscellaneous," subsection (d)(4)(A) is entitled "Compliance with Federal, State, and local laws and professional standards," and subsection (d)(4)(B), on which CMS relies, is entitled "Other."

154.    Thus, subsection (d)(4)(B), on which CMS relies to set required long-term facility nursing staffing levels, addresses "other miscellaneous requirements relating to administration and other matters."

155.    Nothing in subsection (d), or subsection (d)(4)(B), specifically mentions required long-term facility nursing staffing levels.

156.    But, in both statutes, subsection (b)(4)(C)(i), entitled "Required nursing care; facility waivers," specifically addresses required long-care facility nursing staffing levels.

### c. CMS Relies on a Subsection Addressing Individual Plans for Resident Services

157.    Second, CMS cites 42 U.S.C. §§ 1396r(b)(2) and 1395i-3(b)(2), which require long-term care facilities to "provide services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, in accordance with a written plan of care which" meets certain requirements and is "periodically reviewed and revised" under subsection (b)(3), which details how long-term care facilities must assess each resident individually.

158.    In other words, this subsection concerns plans for services for individual residents.

159.    According to CMS, 42 U.S.C. §§ 1396r(b)(2) and 1395i-3(b)(2) "require facilities to provide services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, [and therefore] also supports CMS authority to establish these requirements." 89 Fed. Reg. at 40,890–91.

160.    This subsection does not specifically mention required long-term facility nursing staffing levels.

161.    But, in both statutes, subsection (b)(4)(C)(i), entitled "Required nursing care; facility waivers," specifically addresses required long-care facility nursing staffing levels.

### d. CMS Relies on a Subsection Requiring Long-term Facilities to have a Quality Assessment Committee

162.    Third, CMS cites 42 U.S.C. §§ 1396r(b)(1)(A) and 1395i-3(b)(1)(A), which require long-term care facilities to "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident."

163.    CMS states that those subsections require long-term care facilities to "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the safety and quality of life of each resident." 89 Fed. Reg. at 40,891.

164.    But subsection (b)(1)(B) provides the method by which long-term facilities address residents' quality of life. They must "maintain a quality assessment and assurance committee …

which (i) meets at least quarterly to identify issues with respect to which quality assessment and assurance activities are necessary and (ii) develops and implements appropriate plans of action to correct identified quality deficiencies."

165.    Thus, in both statutes, subsection (b)(1) requires long-term facilities to make decisions and does not mention any power of CMS to impose decisions on long-term care facilities.

166.    In both statutes, subsection (b)(1) does not specifically mention required long-term facility nursing staffing levels.

167.    But, in both statutes, subsection (b)(4)(C)(i), entitled "Required nursing care; facility waivers," specifically addresses required long-term care facility nursing staffing levels.

### D.  CMS's explanation for its Newly Discovered Authority to Impose Minimum Nursing Staffing Requirements

168.    Since the nursing staffing statutes were first enacted in 1965 and 1972, and since they were enacted in their current form in 1989, CMS has never before imposed minimum long-term care facility minimum nursing staffing requirements.

169.    CMS suggests that it is now able to do so because it now has "collected several years of mandated PBJ [Payroll-Based Journal] System data, which was unavailable [before], and new evidence from the literature." 89 Fed. Reg. at 40,880.

170.    CMS does not explain how previously unavailable PSJ System data allows it to impose a minimum long-term care facility minimum nursing staffing requirement.

171.    The "new evidence from the literature" can only mean the Abt Staffing Study, since the literature before the Abt Staffing Study "does not provide a clear evidence basis for setting a minimum staffing level." Abt Staffing Study at xi.

### IV.    HOW THE RULE HURTS TEXAS

172.    The Final Rule impacts Texas in two ways: as a State that regulates long-term care facilities and as a State that administers Medicaid.

173.    The Texas Health and Human Services Commission ("HHSC") submitted comments on the Final Rule. It noted that the Final Rule "will require extensive funding and

27

training for both the [state agency] staff and providers and will increase workload requirements for [State agencies]." Ex. A, HHSC Nov. 3, 2023, Comment letter at 1.

174.    HHSC also noted that "Texas' long-standing shortage of RNs and CNAs [certified nurse aides] and the high level of turnover of these staff in [Medicaid-participating facilities] may prevent many facilities from being able to comply, even with a good faith effort." *Id*.

175.    Moreover, HHSC noted that "Texas' demand for RNs has long exceeded the supply, and this deficit is projected to grow in future years. In 2018, there was a deficit of 27,786 RN FTEs [full time equivalent employees] in Texas, and by 2032, the deficit is expected to grow to 57,012 RN FTEs" and "nursing facilities are currently facing a deficit of between 7,000 and 8,000 CNAs and that number could be upwards of 10,000 based on the high rates of staff turnover and currently vacant positions." *Id*. at 1–2.

176.    Further, HHSC stated that the Final Rule "will merely exacerbate the existing shortages and potentially set up nursing facilities for additional violations due to the inability to meet the staffing requirements. This is especially true for the 24/7 RN requirement which would be difficult to meet especially on nights and weekends. The costs of nursing care are already driving many seniors out of the nursing home market and forcing many nursing facilities to close leaving significant gaps in service availability." *Id*. at 3.

177.    "Additionally, the establishment and management of this process places an unfunded burden on the [state agency] responsible for survey and enforcement of these requirements." *Id*.

178.    Multiple areas within HHSC will be responsible for ensuring compliance with the Final Rule. It affects Long Term Care Regulation, Medicaid and CHIP Services, Quality Monitoring Program, and Regulatory Enforcement. Survey and enforcement of the new rules will increase the workload for HHSC because it is an additional regulation to enforce and will require staff time to assess compliance. HHSC anticipates an increase of citations of noncompliance, enforcement remedies, and more time spent (increased workload) during surveys and investigations.

## V.    LEGAL ANALYSIS

### A.    The Final Rule violates the APA because it is contrary to statute and exceeds the authority granted by Congress.

179.    The Final Rule exceeds CMS's statutory authority and therefore is invalid.

180.    Defendants are agencies subject to the APA.

181.    Under the APA, courts must "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

182.    "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

183.    "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 766 (2021).

184.    As an agency, CMS may not impose nursing staffing requirements contrary to and in excess of the nursing staffing requirements set by 42 U.S.C. §§ 1395i-3(b)(4)(C)(i) and 1396r(b)(4)(C)(i). The Social Security Act itself confirms that the Secretary may not "publish . . . rules and regulations" that are "inconsistent with" the provisions of the Act. 42 U.S.C. § 1302(a); see also 89 Fed. Reg. at 40897, 40898–99 (acknowledging that the detailed statutory scheme for waiving the 8/7 RN requirement "can only be modified by legislation").

185.    CMS claims that the general requirements of 42 U.S.C. §§ 1395i-3(d)(4)(B), 1395i-3(b)(2), 1395i-3(b)(1)(A), 1396r(d)(4)(B), 1396r(b)(2), and 1396r(b)(1)(A) allow it to impose minimum staffing requirements. These provisions authorize regulation for health, safety, and quality of life—not staffing requirements. CMS cannot use these authorizations to contravene Congress's specific policy choices expressed in the statutes with staffing requirements.

186.    *First*, "It is a commonplace of statutory construction that the specific governs the general…. The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission…. But the

canon has full application as well to statutes … in which a general authorization and a more limited, specific authorization exist side-by-side. There the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one, violating the cardinal rule that, if possible, effect shall be given to every clause and part of a statute. The terms of the specific authorization must be complied with." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (cleaned up, citations omitted); see also *Airlines for Am. v. Dep't of Transp.*, No. 24-60231, 2024 WL 3580314, at *2 (5th Cir. July 29, 2024) ("Reading the catch-all authority in [one statute] to justify the Rule would obliterate the directly applicable textual limits spelled out in [another statute]"); see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 183 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision controls.").

187.     CMS's reading of the general requirements of 42 U.S.C. §§ 1395i-3(d)(4)(B), 1395i-3(b)(2), 1395i-3(b)(1)(A), 1396r(d)(4)(B), 1396r(b)(2), and 1396r(b)(1)(A) to justify the Final Rule obliterates the textual limits in 42 U.S.C. §§ 1395i-3(b)(4)(C)(i) and 1396r(b)(4)(C)(i).

188.     Second, courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021) (cleaned up). The "breadth of the authority" CMS asserts and "the economic and political significance" further confirm that CMS is exceeding its delegated authority. *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). The history and practice of Congress in direct opposition to the CMS rule, as well as the fact that the rule would require more than 79% of nursing facilities to increase staffing levels at a cost of over $5 billion per year demonstrate that CMS has exceeded its delegated authority. *See* 89 Fed. Reg. at 40877, 40970.

189.     Reading the general requirements of 42 U.S.C. §§ 1395i-3(d)(4)(B), 1395i-3(b)(2), 1395i-3(b)(1)(A), 1396r(d)(4)(B), 1396r(b)(2), and 1396r(b)(1)(A) to justify the Final Rule and impose huge costs and requirements is a prohibited reading under the Major Questions Doctrine.

**B.    The Final Rule violates the APA because it is arbitrary and capricious.**

190.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

191.    The APA's arbitrary-and-capricious standard requires that agency action be "reasonable and reasonably explained." *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022)(quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

192.    Agency action must be set aside when the agency "fail[ed] to respond to significant points . . . raised by the public comments." *Huawei Techs USA, Int'l v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021).

193.    CMS has failed to reasonably explain the 3.48, 0.55, and 2.45 nursing staff levels.

194.    Whatever benefits increased staffing may theoretically provide, CMS has not explained at all how setting these levels will improve quality of life for long-term care residents.

195.    CMS relies on a flawed report (the Abt Staffing Study) that does not support the imposition of any minimum nurse staff levels at long-term care facilities and provides zero evidence in favor of the 3.48, 0.55, and 2.45 nursing staff levels.

196.    CMS says it relies on other information to set the levels but does not explain how.

197.    CMS does not explain how long-term care facilities can possibly comply with the Final Rule, given the enormous costs it imposes and the well-known nursing shortage.

198.    Therefore, the Final Rule is arbitrary and capricious.

199.    Moreover, an agency must provide "a reasoned analysis for [a] change beyond that which may be required when an agency does not act in the first instance." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). And "the agency must show that there are good reasons for the new policy." *Id.* at 515.

200.    Agencies must also "provide a more detailed justification than what would suffice for a new policy created on a blank slate … when its prior policy has engendered serious reliance interests that must be taken into account." *Id.*

201.    CMS has not provided a sufficiently reasoned analysis for its decision to act and impose minimum staffing requirements when it did not do so for decades and has not provided good reasons for doing so. The Final Rule is therefore arbitrary and capricious.

202.    When an agency's "prior policy has engendered serious reliance interests that must be taken into account, it would be arbitrary or capricious to ignore such matters." *Fox Television Stations*, 556 U.S. at 515.

203.    Texas has no minimum long-care facility nursing staffing requirements and has serious reliance interests that must be taken into account. CMS's justification for the Final Rule is insufficient. The Final Rule is therefore arbitrary and capricious.

204.    "Under the arbitrary-and-capricious standard, [an agency] must show that it has reasonably considered the relevant issues and reasonably explained the decision. That requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within." *U.S. Chamber of Commerce v. U.S. Sec. & Exch. Comm'n,* 85 F.4th 760, 774 (5th Cir. 2023) (citation omitted).

205.    CMS failed to consider Texas's comment that there are not enough nursing staff in Texas for long-term care facilities in Texas and that there are insufficient human resources to comply with the Final Rule and that the Final Rule will put long-term care facilities that cannot comply with the Final Rule out of business, harming residents who lose their homes and future residents who have fewer options. The Final Rule is therefore arbitrary and capricious.

## VI.    CLAIMS FOR RELIEF

### COUNT 1
### Violation of APA, 5 U.S.C. § 706(2)(C):
### In Excess of Statutory Jurisdiction of Authority

206.    All foregoing allegations are repeated and realleged as if fully set forth herein.

207.    The Final Rule challenged herein constitutes "agency action" pursuant to 5 U.S.C. § 551(13) for purposes of review under the APA, 5 U.S.C. § 702.

208.    The Final Rule exceeds CMS's statutory authority and therefore violates the APA, 5 U.S.C. § 706(2)(C).

209.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

210.    42 U.S.C. §§ 1395i-3(b)(4)(C)(i) and 42 U.S.C. § 1396r(b)(4)(C)(i)(I), (II) establish minimum nurse staffing levels at long-term care facilities. CMS may not impose different minimum nurse staffing levels at long-term care facilities.

211.    42 U.S.C. §§ 1395i-3(b)(4)(C)(i) and 42 U.S.C. § 1396r(b)(4)(C)(i)(I), (II) allow CMS to waive requirements, not impose more requirements.

212.    CMS may not read 42 U.S.C. §§ 1396r(d)(4)(B) and 1395i-3(d)(4)(B), 42 U.S.C. §§ 1396r(b)(2) and 1395i-3(b)(2), or 42 U.S.C. §§ 1396r(b)(1)(A) and 1395i-3(b)(1)(A) to authorize it to impose minimum nurse staffing levels at long-term care facilities because even if the general terms of those statutes could be read to allow such an imposition, the specific terms in 42 U.S.C. §§ 1395i-3(b)(4)(C)(i) and 42 U.S.C. § 1396r(b)(4)(C)(i)(I), (II) control.

213.    Reading 42 U.S.C. §§ 1396r(d)(4)(B) and 1395i-3(d)(4)(B), 42 U.S.C. §§ 1396r(b)(2) and 1395i-3(b)(2), or 42 U.S.C. §§ 1396r(b)(1)(A) and 1395i-3(b)(1)(A) to authorize CMS to impose minimum nurse staffing levels at long-term care facilities, inflicting enormous costs, requiring the hiring of tens of thousands of registered nurses and nurse aids who do not exist, and shutting down many long-term care facilities, is a prohibited reading under the Major Questions Doctrine.

### COUNT 2
### Violation of APA, 5 U.S.C. § 706(2)(A):
### Arbitrary, Capricious, Abuse of Discretion, Not in Accordance with Law

214.    All foregoing allegations are repeated and realleged as if fully set forth herein.

215.    The Final Rule challenged herein constitutes "agency action" pursuant to 5 U.S.C. § 551(13) for purposes of review under the APA, 5 U.S.C. § 702.

216.    The Final Rule is arbitrary and capricious and therefore violates the APA, 5 U.S.C. § 706(2)(A).

217.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

218.    The Final Rule is neither reasonable nor reasonably explained.

219.    The Final Rule is a change in CMS's previous decades-long position that it should not impose minimum nurse staffing levels. CMS has failed to explain why it made the change now.

220.    CMS failed to take reliance interests engendered by its previous policy into account.

221.    CMS did not consider factors raised by the public comments or provide a response to significant points raised within.

## VII.    DEMAND FOR RELIEF

Plaintiff Texas respectfully requests that the Court:

a.  Declare that the 24/7 requirement violates the Administrative Procedure Act because it exceeds statutory authority;

b.  Declare that the 24/7 requirement violates the Administrative Procedure Act because it is arbitrary and capricious;

c.  Vacate and set aside the 24/7 requirement and permanently enjoin Defendants from enforcing that requirement;

d.  Declare that the 3.48, 0.55, and 2.45 hour per resident day requirements violate the Administrative Procedure Act because they exceed statutory authority;

e.  Declare that the 3.48, 0.55, and 2.45 hour per resident day requirements violate the Administrative Procedure Act because they are arbitrary and capricious;

f.  Vacate and set aside the 3.48, 0.55, and 2.45 hour per resident day requirements and permanently enjoin Defendants from enforcing those requirements;

g.  Grant Texas an award of attorneys' fees and other litigation costs reasonably incurred in this action; and

h.  Grant Texas such other relief as the Court deems just and proper and as justice so requires.

Dated: August 14, 2024

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Chief, Special Litigation Division

Respectfully submitted,

/S/  JOHNATHAN STONE

JOHNATHAN STONE
Special Counsel
Tex. State Bar No. 24071779
johnathan.stone@oag.texas.gov

JACOB PRZADA
Special Counsel
Tex. State Bar No. 24125371
jacob.przada@oag.texas.gov

KYLE S. TEBO
Special Counsel
Tex. State Bar No. 24137691
kyle.tebo@oag.texas.gov

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-2613

COUNSEL FOR PLAINTIFF STATE OF TEXAS